UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


ROGER BYRNE,
Plaintiff / Counterclaim Defendant,

Case No. 06-12179

v.

SENIOR UNITED STATES DISTRICT
JUDGE ARTHUR J. TARNOW

UNITED STATES,
Defendant / Counterclaimant,

v.

ERIC KUS,
Counterclaim Defendant

_____/


**FINDINGS OF FACT AND CONCLUSIONS OF LAW; ORDER TO SUBMIT PROPOSED JUDGMENT**

This matter came before the Court on June 22, 2015, for a bench trial. After the trial concluded on June 24, 2015, the Court took the matter under advisement. The Court now issues the following findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a)(1).

The Court concludes that Byrne and Kus willfully withheld payroll taxes for the third and fourth quarters of 2000 and are liable for those taxes under 26 U.S.C.

1

§ 6672(a).  The United States is ordered to submit a proposed judgment within 30 days after issuance of this Order.

## FINDINGS OF FACT

In 1998, Eagle Picher Corporation, a large manufacturing concern, owned a division that produced interior trim parts for automobiles that the company sold to vehicle manufacturers like General Motors (GM), Ford, and Chrysler.  The trim division's factory was located in Kalkaska, Michigan.  Hundreds of employees, in manufacturing and in administration, worked at the Kalkaska plant.  Eagle Picher's trim division also had a sales office in the Detroit area, 250 miles to the southeast of Kalkaska.  In 1998, Eagle Picher put its trim division up for sale.

Eric Kus and Gary Anderson decided to buy Eagle Pitcher's trim division. They assembled a small group of investors, consisting of Kus, Anderson, Roger Byrne, Bernard Fuller, Jim Kerstiens, Ken Easterday, and Dorsey Anderson.  They negotiated a $15 million purchase price with Eagle Picher; negotiated a financing package with General Motors Acceptance Corporation Business Credit LLC (GMAC); and closed the deal effective October 31, 1998.  To take possession of the purchased property, Eagle Trim, Inc. and Eagle Land Holdings, LLC were created.  The new venture operated through Eagle Trim.  Eagle Land was just a holding company for the real estate.

Part of the financing package was a revolving line of credit provided by GMAC to Eagle Trim. The financing agreement gave GMAC the right to have an accounting firm of its choice examine Eagle Trim's business records on a periodic basis. GMAC used different firms, including Lender Services and Iannuzzi & Darling, LLC, to conduct these "collateral reviews." The collateral reviewers' findings were provided directly to GMAC, not Eagle Trim, and were not routinely shared with Eagle Trim.

The GMAC financing agreement also required Eagle Trim to provide GMAC with annual financial statements audited by a CPA firm. Eagle Trim hired the CPA firm of Weber, Curtin, & Drake, P.C. (WCD) to conduct these year-end audits and to prepare Eagle Trim's corporate income tax returns. In a December 10, 1998 letter describing the scope of its services (Exhibit 4), WDC stated that it would design its audits "to provide reasonable assurance of detecting errors or fraud that would have a material effect on the financial statements." WDC cautioned, however, that its audits would not include a detailed check of the company's transactions and accordingly would not constitute a guarantee of accuracy.

Upon Eagle Trim's formation, Kus was the Chairman and Chief Executive Officer (CEO) of Eagle Trim. Roger Byrne was the president of Eagle Trim.

3

Bernard Fuller was the controller at Eagle Trim. Fuller's controller position required him to assume new duties, including payroll tax deposits and payroll tax returns. On January 29, 1999, WCD provided Fuller with the forms he needed to ensure that Eagle Trim's tax liabilities remained current. WCD also enclosed several pages from a Circular E that provided instructions on how to prepare and file payroll taxes.

In early 1999, Kus and Byrne learned that Fuller had not been depositing payroll taxes with the IRS on time, and this failure resulted in a large penalty assessment against Eagle Trim. As the year 1999 progressed, Kus and Byrne decided that Fuller was not adequately performing his duties. On December 17, 1999, Kus gave Fuller a handwritten list of tasks he needed to start completing accurately and timely.

On March 6, 2000, GMAC's auditor Lender Services sent a letter (Exhibit 11) to GMAC. The letter stated that Eagle Trim had provided inadequate supporting documentation for Lender Services' collateral reviews and recommended, among other things, that Eagle Trim implement procedures to "[e]nsure all tax payments are made timely with supporting detail retained." GMAC forwarded this letter to Eagle Trim, and it was reviewed by Kus. On March 14, 2000, Fuller sent a letter (Exhibit 13) to GMAC, responding to the

4

points raised by Lender Services.  Fuller acknowledged that he missed two payroll tax deposits during Eagle Trim's switch from Northwestern Bank to National City Bank, but asserted that Eagle Trim was then current with all tax deposits.  Fuller copied Kus and Byrne on this correspondence.

On March 16, 2000, WCD sent a letter (Exhibit 14) to Kus, copying Byrne and Fuller.  The letter advised Eagle Trim of deficits in its accounting practices, which WCD had observed while conducting its 1999 audit.  The letter also stated, however, that WCD's observations did not discover any "material weaknesses," defined as conditions in which Eagle Trim's internal control structure failed to "reduce to a relatively low level the risk that errors or fraud in the amounts that would be material in relation to the financial statements being audited may occur." WCD recommended in its letter that Eagle Trim hire an assistant controller with an accounting degree.

On April 3, 2000, accountant Kelly Gilman joined Fuller's staff as his assistant controller.  Gilman did not handle payroll tax deposits or payroll tax returns.  In July 2000, Andrew Jones was hired as Eagle Trim's Chief Financial Officer.  Jones reported to both Kus and Byrne on financial aspects of Eagle Trim. Fuller reported to Jones and provided him with monthly financial statements for his review.

On October 2, 2000, the IRS sent Eagle Trim a notice (Exhibit 20) of a penalty assessed for unpaid payroll taxes for the first quarter of 2000.  The notice stated that $98,622.32 had not been paid.  However, the notice also stated that a $98,622.32 payment was being applied to Eagle Trim's account and would be reflected on its next notice.  David Drake, a WCD partner, met with Fuller to discuss the penalty.  Fuller informed Drake that he had paid the payroll taxes late because of difficulties associated with Eagle Trim's switch from Northwestern Savings Bank to National City Bank.  He said that he had contacted the IRS several times about the issue and that an IRS representative had informed him that Eagle Trim had made all payroll tax deposits in full and on time since June 14, 2000.

Drake took Fuller at his word.  On October 16, 2000, Drake sent the IRS a letter (Exhibit 22) repeating Fuller's explanation for the late payroll tax deposit. Drake attached an Eagle Trim check to pay the interest on the late payroll taxes and asked that the penalties be waived.  On October 19, 2000, Kus wrote the following on an Eagle Trim financial record (Exhibit 23): "55,000 @MAX payroll taxes not paid."  On November 10, 2000, Fuller sent a letter (Exhibit 24) to Kus, Byrne, and Jones describing the IRS penalty, his meeting with Drake, and Drake's request for an abatement of the penalty.

6

On December 11, 2000, WCD issued an independent auditors' report (Exhibits 25, 61) regarding Eagle Trim's financial statements through September 30, 2000.  The report opined that the financial statements presented Eagle Trim's financial position fairly in all material respects.  The report found that Eagle Trim was current in the payment of payroll taxes.

On January 11, 2001, WCD sent a management letter (Exhibit 28, 64) to Kus, copying Byrne, Jones, and Fuller.  The letter identified flaws in Eagle Trim's accounting practices observed by WCD in the course of its 2000 audit.  The letter included a section devoted to Eagle Trim's failure to pay payroll taxes in a timely manner, recounting the IRS penalties assessed for unpaid payroll taxes in 1999 and the first quarter of 2000.  The letter added that WCD had been informed by "management" (Fuller) that payroll tax deposits for the *second* quarter of 2000 had been untimely as well, though the IRS had not yet assessed a penalty.  WCD recommended that Eagle Trim "take the measures necessary to ensure that all payroll taxes and withholdings are deposited in a timely manner."  WCD stated, however, that its observations did not discover any "material weaknesses" in Eagle Trim's internal control structure.

In January 2001, GMAC's auditor Lender Services discovered that Eagle Trim's financial statements were fraudulently overstated.   Kus and Byrne

approached GMAC and GM for assistance.  Eagle Trim entered a Forbearance Agreement with GMAC, dated January 31, 2001, and an Access and Accommodation Agreement with GM, dated February 2, 2001.  At the time the Forbearance and Accommodation Agreements were executed, Kus and Byrne were unaware that Eagle Trim was delinquent on payroll taxes for the second, third, and fourth quarters of 2000.  Under the Forbearance and Accommodation Agreements, GM hired a turn-around firm, BBK Ltd.  After execution of the Forbearance Agreement, both GMAC and BBK reviewed and approved all funding for Eagle Trim and had complete control over the flow of money in and out of Eagle Trim.

In late February 2001, Byrne and Kus were informed that Eagle Trim was delinquent on its payroll tax deposits for the last three quarters of 2000.  Fuller and Byrne asked BBK for permission to pay these delinquent payroll taxes, and the BBK reviewers refused to approve this expenditure.  Fuller was fired.

On March 1, 2001, WCD sent a letter (Exhibit 62) to Byrne, copying Kus. The letter explained that due to the discovery of "intentional, improper accounting" resulting in material misstatements, Eagle Trim should no longer rely on WCD's audit reports for 1999 and 2000.  The same day, Drake sent a letter (Exhibit 68) to Byrne explaining that WCD was recalling its audit reports due to the discovery that Fuller had been making "a series of incorrect, inaccurate and/or fictitious entries,

primarily related to tooling receivables, pre-paid tooling and accounts payable."

Drake wrote that "there was a significant effort on the part of Mr. Fuller to disguise

these activities, and to prevent their discovery in the course of our audits."

On April 25, 2001, Byrne signed a Chapter 11 bankruptcy petition on behalf

of Eagle Trim in the Eastern District of Michigan.   Eagle Trim eventually

liquidated through this bankruptcy proceeding.   The bankruptcy proceeding also

eventually yielded payments to the IRS for some of Eagle Trim's unpaid payroll

taxes.

On July 25, 2005, a delegate of the Secretary of the Treasury separately

assessed Byrne and Kus with $855,668.35 in penalties under I.R.C. § 6672 for

Eagle Trim's unpaid payroll taxes in the last three quarters of 2000.   Byrne paid

$1000 to the IRS and then filed a claim for a refund of the $1000 and an abatement

of the penalty.   The IRS denied this claim.

On May 11, 2006, Byrne filed his Complaint [1] in this case.   On July 14,

2006, the United States filed its Answer and Counterclaim [6], which included a

third-party claim against Kus.   On September 5, 2006, Kus filed an Answer and

Counterclaim [11] to the United States' third-party claim against himself.[1]   On

---

[1] Other claims in the case have been resolved.  The United States filed a third-party
claim against Fuller, which was resolved with the entry of a Stipulated Judgment
[39] in the amount of $533,284.28 against Fuller on February 28, 2008.  Byrne and

May 12, 2008, the Court issued an Order [40] granting summary judgment to the United States on its claims against Byrne and Kus.  Byrne and Kus appealed.  On September 4, 2012, the Sixth Circuit reversed the Court's grant of summary judgment and remanded for further proceedings.  Byrne and Kus filed a Renewed Motion for Summary Judgment [70] on December 10, 2014, which the Court denied in an Order [96] issued June 16, 2015.  The case proceeded to a bench trial.

### CONCLUSIONS OF LAW

Any person required to pay over federal taxes who willfully fails to do so is liable to a penalty in an amount equal to the unpaid taxes.  26 U.S.C. § 6672(a).  "[A]n individual is liable under § 6672(a) if he or she: 1) is responsible for paying the taxes and 2) willfully fails to turn over the tax money to the government." *Byrne v. United States*, 498 F. App'x 555, 560 (6th Cir. 2012) (unpublished) (citing *Bell v. United States,* 355 F.3d 387, 393 (6th Cir. 2004)).  Byrne and Kus are "responsible persons," satisfying the first element.  *Id.*  However, § 6672(a) does not "impose liability without personal fault."  *Slodov v. United States*, 436 U.S. 238, 254 (1978).  Moreover, the degree of personal fault must exceed mere negligence.  *Byrne*, 498 F. App'x at 561 (citing *Gephart v. United States*, 818 F.2d

---

Kus also filed crossclaims against each other and against Fuller.  On February 3, 2011, Byrne and Kus filed a Stipulation and Voluntary Dismissal Without Prejudice [59] of their crossclaims.

469, 475 (6th Cir. 1987)).   The willfulness element is established only if the responsible person "either [1] deliberately or recklessly disregarded facts and known risks that the taxes were not being paid, or [2] had knowledge of the tax delinquency and knowingly failed to rectify it when there were available funds to pay the government."   *Id.*   The Sixth Circuit identified factual disputes on both of these prongs to be resolved on remand.   *Id.* at 561–63.

At issue is Byrne and Kus's liability for payroll taxes unpaid by Eagle Trim in the third and fourth quarters of 2000.[2]   Byrne and Kus bear the burden of showing that they did *not* willfully withhold these taxes.   *Id.* at 560.   The Court concludes that Byrne and Kus have met this burden on one prong, but not the other.   At no time did Byrne and Kus have actual knowledge of the tax delinquency and fail to use unencumbered funds to pay it.   However, prior to acquiring actual knowledge, Byrne and Kus recklessly disregarded the risk that the taxes had not and would not be paid.   Therefore, Byrne and Kus willfully failed to turn over payroll taxes for the third and fourth quarters of 2000 and are liable for those unpaid taxes under § 6672(a).

I.    **Actual Knowledge**

---

[2] The parties stipulated at trial that Eagle Trim's unpaid payroll taxes for the second quarter of 2000 are no longer at issue.

At no time did Byrne and Kus have actual knowledge of the tax delinquency and fail to rectify it with unencumbered funds. "[T]he failure to pay taxes will not be deemed willful unless there are unencumbered funds available to pay the outstanding taxes." *Ghandour v. United States*, 36 Fed. Cl. 53, 62 (Fed. Cl. 1996); *see also Huizinga v. United States,* 68 F.3d 139, 145 (6th Cir. 1995). Byrne and Kus did not acquire actual knowledge of the delinquency until after the Forbearance Agreement was executed and GMAC/BBK assumed control of Eagle Trim's expenditures. Under the Forbearance Agreement, Kus and Byrne lacked the ability to pay any creditors, including the IRS.[3] Accordingly, their failure to divert funds to the IRS did not constitute a willful failure to pay the taxes.

## II.    Reckless Disregard

Byrne and Kus recklessly disregarded known risks that the payroll taxes for the third and fourth quarters of 2000 would not be paid. The Court draws support

---

[3] The Sixth Circuit, relying on "competing affidavits" of Mark Matheson and Anthony Pierfelice, identified a factual dispute regarding Byrne and Kus's ability to pay creditors after execution of the Forbearance Agreement. *Byrne*, 498 F. App'x at 563. On remand, Matheson submitted a new affidavit, in which he agreed with Pierfelice that Byrne and Kus lacked sufficient control over the funds to pay the IRS. The United States presented no evidence at trial to rebut evidence, including Pierfelice's sworn statements in his affidavit (Exhibit 75), that the funds sourced to Eagle Trim accounts under the Forbearance Agreement were not Eagle Trim property; that Eagle Trim held those funds in trust; and that no person at Eagle Trim had the ability to make payments with those funds without BBK approval.

for this conclusion from *Jenkins v. United States*, 101 Fed. Cl. 122 (Fed. Cl. 2011).

In *Jenkins*, the plaintiff CEO and CFO testified that as of April 1995, he had been

informed by the company president that "there had been a lapse in the timely

payment of [payroll taxes], that it had been remedied, and [the president] had

negotiated an installment agreement that he was then operating under with the

approval of the IRS." *Id.* at 127 & n.10.  The plaintiff admitted, under cross-

examination, that he "did nothing to verify [the president's] claims that the taxes

were being paid." *Id.* 127 n.10.  The Court of Federal Claims found that by this

point, the plaintiff knew the president "was unreliable in ensuring that proper and

timely tax payments would be made," and therefore "could no longer operate on

the good faith belief that [the company and the president] would ensure that the

back taxes were paid." *Id.* at 135.  Thereafter, the court concluded, the plaintiff

"should have monitored whether the taxes, in fact, were being paid." *Id.*  By

failing to do so, the court concluded, the plaintiff recklessly disregarded a known

risk that the taxes were not being paid. *Id.*

Here, the Court concludes that Byrne and Kus exhibited similar recklessness

by relying on Fuller to pay the payroll taxes.  Before executing the Forbearance

Agreement, Byrne and Kus knew that Fuller had failed to pay payroll taxes when

due in 1999 and for the first and second quarters of 2000.  Accordingly, they knew

that Fuller "was unreliable in ensuring that proper and timely tax payments would

be made." *Id.* By failing to take action to verify timely payroll tax deposits for the

third and fourth quarters of 2000, Byrne and Kus recklessly disregarded a risk that

the taxes would not be paid.[4]

Byrne and Kus may have believed there was no need for them to personally

verify timely deposits, since WCD would do so.  Indeed, WCD's January 2000

audit report indicated that Eagle Trim had no current tax delinquency.  Further,

Byrne and Kus knew that Drake (the "D" in WCD) had written a letter to the IRS

repeating Fuller's bank-related excuses for missing the deadline for the first quarter

of 2000, as well as Fuller's claim to have brought Eagle Trim up-to-date with the

IRS as of October 2000.  The Court acknowledges that these facts make the

recklessness issue a close call.

However, Byrne and Kus could not rely on WCD to verify that Fuller had

become a responsible taxpayer without making any inquiry into what WCD

actually did to review his performance of his payroll tax duties. Drake testified at

his deposition (incorporated into the record at trial) that when he drafted his letter

---

[4] Unpaid taxes become "late" taxes only retroactively, as a result of a back payment.  Byrne and Kus executed the Forbearance Agreement knowing that it would render Eagle Trim unable to make back payments without third-party approval.  At that point, the risk that Fuller had not yet made back payments for the third and fourth quarters of 2000 was equivalent to a risk that the payments would never be made.

14

to the IRS regarding the penalty for the first quarter of 2000, all he did was write down Fuller's "story" regarding the missed payments and add some formality to the language.[5]  By implication, Drake did nothing to verify the "story."  In fact, the letter itself hinted that Drake did not get to the bottom of what had happened; Drake wrote that "for some reason," Fuller's use of the wrong checking account to make payroll tax deposits was not discovered for two months.

WCD's January 2000 management letter similarly hinted that WCD was relying on Fuller for information about the payroll tax deposits rather than verifying his claims.  The letter stated that "management" (Fuller) had informed WCD of the reason for the late deposits in 1999 and, more troublingly, of the fact that deposits for the *second* quarter of 2000 had also been late, though no penalty had yet been assessed.  WCD did not report any explanation from Fuller for the untimely deposits for the second quarter of 2000, let alone report that it had investigated Fuller's explanations.[6]  In fact, WCD's letter highlighted the risk of continued untimely payments and offered no concrete suggestions for averting that

---

[5] Fuller's story was that (1) he mismanaged a transfer of Eagle Trim's accounts to a new bank, causing general financial disarray, and (2) after transfer to the new bank was completed, he mistakenly issued payroll tax deposits against the payroll checking account instead of the general checking account.

[6] The report of late payments for the second quarter of 2000 should have been especially alarming to Byrne and Kus in light of the fact that Fuller neglected to mention them in his November letter regarding the IRS penalty for the first quarter of 2000.

15

risk, indicating that Fuller's reliability was still in question and that WCD had not examined it in any comprehensive manner.  In this context, the information from WCD was no cure for Byrne and Kus's recklessness in relying on Fuller to fulfill duties he had fulfilled so unreliably in the past.

### CONCLUSION

The Court concludes that Byrne and Kus willfully withheld payroll taxes for the third and fourth quarters of 2000 and are liable for those taxes under 26 U.S.C. § 6672(a).

**IT IS ORDERED** that the United States will submit a proposed judgment within 30 days after issuance of this Order.

**SO ORDERED**.


                                        s/Arthur J. Tarnow
                                        Arthur J. Tarnow
Dated: August 4, 2015                   Senior United States District Judge